UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-20496-CR-MOORE/D'ANGELO

UNITED STATES OF AMERICA,

vs.

KYLE ALEXANDER LOPEZ
and JERRICK ELAY TAYLOR,

    Defendants.
_____/

### ORDER DENYING DEFENDANTS' MOTIONS TO STRIKE GOVERNMENT'S EXPERTS

**THIS CAUSE** is before the Court on two motions: Defendant Kyle Alexander Lopez's Motion to Strike Government's Firearms Expert and Request for Daubert Hearing filed on January 7, 2026 (DE 75) and Defendants Kyle Alexander Lopez and Jerrick Elay Taylor's Motion to Strike the Government's Expert Shaun Perry filed on January 13, 2026 (DE 86).[1] The Government filed a response in opposition to both Motions on January 21, 2026 and January 27, 2026, respectively (DE 98, 103). The Court held a hearing on the Motions on February 11, 2026, at which the Court received the evidence and arguments of the Parties (DE 117). Having considered the arguments of the Parties, the evidence presented at the February 11, 2026 hearing, and the relevant portions of the record, and being otherwise fully advised in the premises, it hereby **ORDERED and ADJUDGED** that Defendant Lopez's Motion to Strike Government's Firearms Expert and

---

[1] This matter was referred to the undersigned Magistrate Judge to take all necessary and proper action as required by law and/or to submit a Report and Recommendation regarding all matters and pretrial motions, except motions for continuance of trial (DE 54). Defendant Lopez's Motion to Strike Government's Firearms Expert and Request for Daubert Hearing was also referred to the undersigned Magistrate Judge to take all necessary and proper action as required by law (DE 83).

Request for Daubert Hearing and Defendants Lopez and Taylor's Motion to Strike the Government's Expert Shaun Perry are **DENIED**.

I. **FACTUAL BACKGROUND**

On August 22, 2024, a Grand Jury sitting in the Southern District of Florida returned a nine-count Indictment against Defendants (DE 38). Defendant Lopez is charged in Counts One, Two, Three, Seven, Eight, and Nine with the following offenses: Conspiracy to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 846, Distribution of a Controlled Substance, in violation of Title 21, United States Code, Section 841(a), Possession with Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code, Section 924(c)(1)(A), and Possession of an Unregistered Firearm, in violation of Title 26, United States Code, Section 5861(d) (*id.*). Defendant Taylor is charged in Counts One, Three, Four, Five, and Six with the following offenses: Conspiracy to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 846, and Distribution of a Controlled Substance, in violation of Title 21, United States Code, Section 841(a) (*id.*).

On January 5, 2026, the Government filed a Notice of Intent to Introduce Expert Testimony of Detective Robert F. Thompson (DE 68). The Government stated in the Notice that Defendant Lopez had been provided with a copy of Detective Thompson's report, qualifications, and a list of prior expert testimony (*id.* at 1). According to the Government, "Detective Thompson will testify as to the nature of firearms and machinegun conversion devices, as the terms are defined under federal law" (*id.* at 2). The Notice further states that Detective Thompson "analyzed the machinegun conversion device recovered in this case and concluded that it is a part designed and intended solely and exclusively, or combination of parts designed and intended, for use in

converting a weapon into a machinegun . . ." (*id.*).² Lastly, Detective Thompson will testify that the machinegun conversion device was not registered to Defendant Lopez (*id.*).

The Government also filed a Notice of Intent to Introduce Expert Testimony of former Drug Enforcement Administration Special Agent Shaun N. Perry (DE 65). The Government summarized Mr. Perry's training and experience and listed previous cases in which Mr. Perry has provided expert testimony (*id.* at 1-2, 4). The Government further stated that Mr. Perry "is expected to testify about the practices that traffickers employ when distributing narcotics, the manner in which drugs are packaged for trafficking, the cash nature of the business, and the areas where drug dealers keep their 'stash'" (*id.* at 2). In Mr. Perry's opinion, "the manner in which the narcotics [seized in this case] are packaged is consistent with the distribution of narcotics" (*id.*). Mr. Perry will also testify about drug distribution networks, "tools of the trade" as they relate to drug distributors, and firearms and ammunition as additional tools of the drug distribution trade (*id.*). According to the Government, Mr. Perry will testify that "the presence, location, and nature of [the firearm and related items seized in this case] are consistent with armed drug trafficking and the extent to which the same are inconsistent with safe and responsible gun ownership" (*id.* at 3).³

---

² In his report, Detective Thompson concludes that "the recovered 3D printed polymer 'parts kit', Glock pattern MCD fulfills the plain text of the definition of a machinegun as outlined in . . . [S]ection 5845(b) and in its current condition its possession is prohibited . . . under [18 U.S.C. § 922(o)]" (DE 75 at 30). The Government stated at the February 11, 2026 hearing that *it did not intend to introduce Detective Thompson's report into evidence or ask him to draw conclusions on ultimate issues that are reserved for the jury*, as the trier of fact. As the Court noted, should improper testimony at trial be elicited by the Government on issues reserved for the jury, Defendant Lopez may object and seek a ruling from the District Judge.

³ The Government's Notice also stated that Mr. Perry will opine on "the fact that adjudicated delinquents are not able to purchase firearms through regular retail channels, and that convicted felons typically have to obtain firearms through illicit channels, such as street sales of firearms, or by having friends or family members purchase firearms on their behalf" (DE 65 at 3). Defendants Lopez and Taylor objected to this opinion, as neither are adjudicated delinquents nor convicted felons. At the February 11, 2026 hearing, the Government agreed that at this time, it was not presenting evidence at trial that Defendants Lopez and Taylor were adjudicated delinquents or

Mr. Perry will also discuss drug traffickers' use of firearms and stash houses to protect their narcotics and interpret words used in YouTube videos of Defendant Lopez's songs that relate to narcotics distribution and firearms (*id.* at 3-4).

## II. THE FEBRUARY 11, 2026 HEARING

At the February 11, 2026 hearing, the Court permitted the Parties to engage in limited examinations of Detective Thompson and Mr. Perry to assist the Court in its *Daubert* inquiry. Detective Thompson testified that as stated in his report, the machinegun conversion device recovered in this case would not immediately convert a firearm into a machinegun, because it was missing the extended leg. Detective Thompson testified that he physically examined the machinegun conversion device recovered in this case but did not attempt to place it on a firearm and fire it. When asked about whether the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") had issued guidance on whether parts could be *readily restored* to function as a machinegun conversion device, Detective Thompson testified that there is no specific guidance, and it is left to the knowledge and experience of the examiner to articulate whether the parts could be readily restored to convert a firearm into a machinegun, as defined by Section 5845(b).

As to the missing extended leg component, Detective Thompson testified that the piece could be manufactured in around eight to ten minutes with a 3D printer. He stated that he taught a class on at least fifty occasions in the past two years, where participants use a 3D printer to manufacture this component, which is the easiest to reproduce. Detective Thompson described the extended leg as a flat piece of plastic about half the size of toothpick with a circle cut out, which can be traced on a piece of plastic or printed using images downloaded from the dark web.

---

convicted felons and withdrew this opinion from Mr. Perry's proposed testimony. The Court admonished the Government that if the Government sought to elicit an opinion from Mr. Perry on this topic, *the Government must first obtain a ruling from the Court that such evidence is admissible prior to presenting it to the jury*.

4

Detective Thompson stated that if the machinegun conversion device were placed on a newer model Glock firearm, but not an older model Glock, the frame would need to be modified, which could be done with a knife or file in ten to fifteen minutes. Lastly, Detective Thompson stated that in his twenty years of experience, he would only expect to find the two parts recovered in this case - the casement and the cross pin – together as part of a 3D printed parts kit for a machinegun conversion device capable of fitting the rear slide of a Glock firearm. He further described how characteristics of the "pretty unique" parts, including the little shelf that fits onto the frame rails of the Glock slide and the circle cutout on the interior of the cover plate designed to capture the firing pin sleeve, can be recognized through visual inspection without the need to conduct a test fire.

      Mr. Perry testified that he reviewed reports, including state arrest reports, lab reports, and reports of the case agent, and photographs related to this case. He further stated that he was asked to interpret slang terms used in YouTube videos related to narcotics trafficking. According to Mr. Perry, based on his training and experience, he looked at the totality of the circumstances to determine whether the presence, location, and nature of a firearm recovered here is consistent with armed drug trafficking. Specifically, Mr. Perry stated that factors used to form his opinion included, but were not limited to, the presence of the firearm and its proximity to narcotics, the location where the firearm was seized, whether the firearm was loaded and locked, and whether the firearm was in plain view or concealed. He testified that he also considered whether the firearm was made safe, locked away, placed in a lock box, had a lock on it, was rendered inoperable, was brandished, or was readily accessible to a narcotics trafficker in opining on whether the presence of a firearm was consistent with safe gun ownership and how drug traffickers use firearms to protect narcotics.

Mr. Perry further testified about locations where drug traffickers store narcotics, including stash houses, based on patterns of behavior observed throughout the course of his training and experience. Mr. Perry stated that he considers the presence and amount of narcotics, the location, the way the premises is operated, what is found inside, the number and nature of the people found inside, how the premises is set up, and what is happening outside the premises. Mr. Perry further explained the presence of armed individuals or look-outs outside the location may also inform his opinion about whether a particular location operates as a stash house. Mr. Perry stated that the reference to "tools of the trade" in his opinions means instruments used in the enterprise of drug trafficking. Mr. Perry testified that over the course of his experience, he has been involved in searches where unloaded firearms have been discovered and seized. Finally, Mr. Perry stated that in forming his opinions, he considers all the facts and circumstances he previously encountered in his experience, including participating in narcotics investigations and related search warrants. According to Mr. Perry, the bases of his conclusions are drawn from his work on prior investigations, including those that resulted in arrests, search warrants, and convictions, and ultimately, a review of the totality of the circumstances based on his years of investigations and working narcotics.

### III.  LEGAL STANDARD

"[I]t is by now axiomatic that a district court enjoys 'considerable leeway' in making [determinations about the admissibility of expert testimony]." *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004). Under Federal Rule of Evidence 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert . . . evidence." *Frazier*, 387 F.3d at 1260.

> Thus, district courts must engage in a three-part inquiry in determining the admissibility of expert testimony under Rule 702, considering whether:
>
> > (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Holt*, 777 F.3d 1234, 1265 (11th Cir. 2015) (citations omitted).

"'The operations of narcotics dealers are a proper subject for expert testimony under Rule 702,' and we have recognized the 'well-established' 'rule' that 'an experienced narcotics agent' may testify as an expert to help a jury understand 'the significance of certain conduct or methods of operation unique to the drug distribution business.'" *United States v. Garcia*, 447 F.3d 1327, 1335 (11th Cir. 2006). "[W]hen an expert relies 'solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *United States v. Holmes*, 141 F.4th 1183, 1198 (11th Cir. 2025) (citations omitted). However, "an expert witness may not testify as to his opinion regarding ultimate legal conclusions[,]" except as permitted by Federal Rule of Evidence 704. *United States v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009). Rule 704 states:

> (a) In General--Not Automatically Objectionable. An opinion is not objectionable just because it embraces an ultimate issue.

> (b) Exception. In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state . . . that constitutes an element of the crime charged . . . . Those matters are for the trier of fact alone.

Fed. R. Evid. 704(a), (b).

## IV. DISCUSSION

### A. Detective Thompson's Anticipated Expert Testimony

In Defendant Lopez's Motion, he challenges the reliability of Detective Thompson's opinion, because he did not "point to any reports or studies supporting his findings and, by his own admission, he did not test his conclusions and provided no scientific data or literature to support his conclusion" that the parts recovered are a machinegun conversion device (DE 75 at 10). Put differently, Defendant Lopez contends that Detective Thompson's opinion is unreliable, as he uses "non-existent facts in this case" and "speculation," asserting that the extended leg can be recreated in minutes with a 3D printer (*id.* at 10-11). Defendant Lopez also claims that Detective Thompson's opinion will not help the jury, because "the ATF Fact Sheet tells the jury all they need to know about the device" (*id.* at 13).

The Government argues that detective Thompson's opinion is reliable, because it is based on "his extensive training and experience specific to machineguns" (DE 98 at 5). Expanding on this argument, the Government contends that Detective Thompson will explain *how* his training, experiences, and familiarity with 3D printed conversion devices, supports his ultimate opinion that police recovered a machinegun conversion device in this case (*id.* at 5-6). Detective Thompson will also testify how he reached his opinion based on his experience that a disconnector leg can be recreated in less than 30 minutes (*id.* at 6). The Government similarly contends that Detective Thompson's opinion will help the jury determine whether Defendant Lopez unlawfully possessed a machinegun conversion device under the statute (*id.* at 9).

At the outset, Defendant Lopez does not contest that Detective Thompson is qualified to testify as a firearms expert, and Detective Thompson's Statement of Qualifications support his classification as such (DE 68-1). As to the methodology used by Detective Thompson in reaching his conclusions, he relies on his extensive experience with firearms and machinegun conversion devices to reach his conclusions in this case. "[I]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261. In both his report and during the February 11, 2026 hearing, Detective Thompson explained how his experience led to the conclusion that what he examined was a machinegun conversion device and how he could reach that conclusion based on his experience, even without placing the device on a Glock and firing it.

Detective Thompson stated that the parts variant kit relevant here, which is "pretty unique," contains three parts and that the two parts recovered by law enforcement - the casing and the pin - in his extensive and uncontested experience would not be found together for any other use besides a machinegun conversion device. He also described how his visual inspection allowed him to identify specific characteristics of the parts that interface with a Glock firearm and to recognize the parts as a machinegun conversion device. Detective Thompson described his repeated experience using a 3D printer to manufacture these parts during a firearms course he teaches and the ease with which the extended leg can be reproduced. Detective Thompson's report and testimony established that he reliably applied his experience to the parts presented to him in concluding that those parts were designed and intended solely and exclusively, or in combination, to modify a semiautomatic firearm into a firearm that expels multiple projectiles with a single function of the trigger.

9

Lastly, Detective Thompson's expert testimony will assist the jury in understanding the firearms evidence at issue. Here, Detective Thompson's specialized knowledge and expertise related to firearms will assist the jury in deciding whether the parts recovered by law enforcement meet the statutory definition of a machinegun. Moreover, a lay person would not know or understand how a machinegun conversion device works, how it can be manufactured using a 3D printer, and how the parts recovered may, or may not, be able to interface with a Glock firearm to create a machinegun. Indeed, Detective Thompson's testimony will assist the jury in determining whether the parts recovered can be assembled to convert a Glock semiautomatic pistol into a fully automatic pistol and whether their possession was unlawful. Accordingly, the Government has sufficiently shown that the proposed expert testimony of Detective Thompson is admissible.

### B. Mr. Perry's Anticipated Expert Testimony

Second, Defendants Lopez and Taylor challenge the admission of Mr. Perry's proposed expert testimony. They argue that Mr. Perry's opinion is unreliable as he did "not apply scientific testing, statistical analysis, or even systematic comparison to documented case studies" to support his conclusion (DE 86 at 11). Instead, like Detective Thompson, Mr. Perry's opinion is supported by "his experience" and that experience alone, according to Defendants Lopez and Taylor, does not satisfy *Daubert* (*id.*). Further, these Defendants maintain that Mr. Perry's opinion does not help the jury and is "a [c]onduit for [i]nadmissible [h]earsay," because it is unreliable (*id.* at 12).

The Government argues that Mr. Perry's opinion is reliable, as it is based on substantial experience, including handling hundreds of drug investigations, hundreds of search warrants, hundreds of drugs and firearm seizures, and interactions with drug traffickers in an undercover capacity (DE 103 at 5). From the Government's perspective, Mr. Perry's opinion is reliable, as he will apply his "extensive experience" to the facts (*id.*). Further, the proffered testimony will help

10

the jury understand if the narcotics were intended for distribution and if the weapon was used to advance drug-trafficking (*id.* at 5-6).

Again, Defendants Lopez and Taylor do not contest that Mr. Perry is qualified to testify as an expert in narcotics trafficking and the use of firearms in narcotics trafficking, and Mr. Perry's long career as a DEA Special Agent for approximately twenty-nine years supports his classification as such (DE 65). Moreover, Mr. Perry has previously been qualified as an expert in these areas in multiple cases in this District. *See, e.g.*, *United States v. Laines*, 69 F.4th 1221, 1227 (11th Cir. 2023) (noting Mr. Perry testified about packages of drugs as an expert witness); *United States v. Holmes*, 141 F.4th 1183, 1191 (11th Cir. 2025) ("The government also called Special Agent Shaun Perry to testify as an expert witness about 'the techniques and practices used by street-level narcotics traffickers,' such as 'the use of firearms for dispute resolution and protection during narcotics trafficking.'"); *United States v. Moncrieffe*, No. 22-10351, 2023 WL 3644647, at *2 (11th Cir. May 25, 2023) ("The district court abused no discretion in admitting Agent Perry's expert testimony." (per curiam)). The Eleventh Circuit has "described as 'well-established' that 'an experienced narcotics agent may testify as an expert to help a jury understand the significance of certain conduct or methods of operation unique to the drug distribution business.'" *Moncrieffe*, 2023 WL 3644647, at *2 (citation omitted) (per curiam).

Like Detective Thompson, Mr. Perry draws primarily on his extensive experience as a DEA Special Agent and participation in almost three decades of narcotics investigations to form his opinions and conclusions. Mr. Perry, too, explained through his testimony at the February 11, 2026 hearing and in the Government's Notice, how his training and experience supported his conclusions, the evidence that he relied upon in forming those conclusions, and the facts and circumstances he looks to, when considered as a whole, in rendering his opinion. Indeed, the

Government's Notice details that Mr. Perry has been involved in hundreds of narcotics investigations, hundreds of residential search warrants, hundreds of drug and firearm seizures, hundreds of arrests, hundreds of interviews of drug traffickers, thousands of surveillance operations, and interactions with drug traffickers in an undercover role, as well as the study of communication by drug traffickers and activity related to Title III intercepts.

Mr. Perry's methodology, therefore, was a straight-forward application of his long history of narcotics work to inform his opinions about narcotics distribution and instruments used in the enterprise of drug trafficking, the presence of firearms in conjunction with armed drug trafficking, locations where drug traffickers store narcotics, and common slang words or phrases associated with armed drug trafficking.  *See Holmes*, 141 F.4th 1183 at 1198 (describing Mr. Perry's methodology as a "relatively clear" application of his "long history of experience in drug investigations" that taught him about various aspects of street-level distribution and the use of firearms).  Mr. Perry also explained that he reviewed various reports and photographs to apply his methodology to the instant facts in reaching his conclusions and that he has participated in, supervised, or otherwise played a role in factual scenarios and investigations that reasonably relate to the circumstances of this case.  Mr. Perry, thus, reasonably applied his methodology to form his opinions about whether the facts he reviewed are consistent with drug trafficking and "how and why a drug dealer would carry a gun with them 'in furtherance' of their drug dealing scheme."  *Id.*

Mr. Perry's expert testimony will also assist the jury in understanding the evidence presented in this case.  Particularly, expert testimony about methods of narcotics distribution, instruments of distribution, packaging, storage, and proceeds will assist the jury in understanding the significance of the evidence, if any, as well as the significance of the firearms evidence.  *See Moncrieffe*, 2023 WL 3644647, at *2 ("[T]he district court determined reasonably that Agent

Perry's expert witness testimony would assist the jury in understanding the evidence, including the significance of the drug packaging and the firearm involved in this case." (per curiam)); *see also United States v. Fonseca*, 727 F. App'x 985, 992 (11th Cir. 2018) (finding a law enforcement officer's expert testimony "helpful to jury members, who would not know the significance of certain conduct or methods of operation unique to the drug distribution business" (per curiam)). Mr. Perry's testimony will also assist the jury in understanding coded language that is frequently used in the enterprise of drug trafficking. *See United States v. Holt*, 777 F.3d 1234, 1266 (11th Cir. 2015) (finding the agent's testimony "helped the jurors understand the meaning of the defendants' coded language" in narcotics trafficking); *United States v. Garcia*, 447 F.3d 1327, 1337 (11th Cir. 2006) (approving the admission of an expert opinion about the drug traffickers' use of coded language).[4] As a result, the Government has adequately established that the proposed expert testimony of Mr. Perry is admissible.

## V. CONCLUSION

Based on the foregoing, it is hereby **ORDERED and ADJUDGED** that Defendant Kyle Alexander Lopez's Motion to Strike Government's Firearms Expert and Request for Daubert Hearing (DE 75) and Defendants Kyle Alexander Lopez and Jerrick Elay Taylor's Motion to Strike the Government's Expert Shaun Perry (DE 86) are **DENIED**. The Court announced its rulings on the record at the February 11, 2026 hearing, which are fully incorporated herein, and the Court's rulings are effective as of that date. As stated at the February 11, 2026 hearing, these rulings

---

[4] As stated at the February 11, 2026 hearing, the Court has not ruled on the admissibility of any YouTube videos at trial, and nothing in this Order should be construed as determining whether such evidence would be admissible.

remain subject to reconsideration by the District Court "based on developments at trial or on its sound judicial discretion." *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010).

**DONE AND ORDERED** in Chambers at Miami, Florida, this 25th day of February, 2026.

                                                                                                        _____
                                                                                                          HONORABLE ELLEN F. D'ANGELO
                                                                                                          UNITED STATES MAGISTRATE JUDGE

cc:     All counsel of record